**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No.:

**CRAIG FAULHABER,**

**and those similarly situated**,

Plaintiff,

vs.

**PETZL AMERICA, INC. D/B/A PETZL**

Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

COMES NOW Plaintiff, Craig Faulhaber through legal counsel M$^c$Leod │Brunger PLLC, and hereby submits his Complaint and Jury Demand on behalf of himself and those similarly situated ("Plaintiff" or "Faulhaber") against Defendant, Petzl America, Inc. d/b/a Petzl, and in support thereof, alleges as follows:

**I.      INTRODUCTION**

1.      This case arises from the defective design, manufacture, and failure to warn that the Petzl Shunt, a device intended, marketed and sold by Petzl as a safety device, could detach from a climbing rope and cause death or serious bodily injury, as experienced by Plaintiff Craig Faulhaber within the state of Colorado.

2.      Craig Faulhaber hit the ground, suffered serious bodily injuries, and could have died but for the heroic efforts of witnesses and Summit County Mountain Rescue for only one reason – his Petzl Shunt failed him.

3.      Following Plaintiff's injuries sustained after his Petzl Shunt failed near Keystone in Summit County, Colorado, Faulhaber contacted Petzl via email to info@petzl.com on October 30, 2021 to alert them to his event and to attempt to get Petzl to act in order to warn other climbers, pull the product from the market, or re-design and manufacture a safer device.

4.      Faulhaber also had a subsequent email exchange and a telephone call with Petzl's Utah-based Chief Operating Officer Tom Adams on November 10, 2021 who was opaque about the Shunt's testing, known use, and deficiencies on the phone, otherwise being dismissive of Faulhaber's request for a prominent and unambiguous warning or a re-design of the Shunt.

5.      Petzl's Chief Operating Offer Tom Adams also rejected or ignored Craig Faulhaber's offer to participate in the crafting of a suitable warning so other people are not injured or killed.

6.      Faulhaber unambiguously informed Petzl's Chief Operating Officer that not only was the Shunt a very popular setup in the top rope solo community, but also that the climbing community seems to use the Petzl Shunt for this as its primary purpose.

7.      Faulhaber advised Petzl's Chief Operating Offer that the climbing community believes that a stopper knot is a viable backup to the Petzl Shunt while rope soloing, which Faulhaber knows today that it is not, since it appears that Faulhaber's Petzl Shunt allowed his rope to detach from the Shunt before the Shunt even hit Faulhaber's stopper knot.

8.      Faulhaber also told Petzl's Chief Operating Officer that he uncovered a study from the Health and Safety Executive (HSE), which Petzl never informed, let alone warned, the climbing community about, specifically, HSE advised:

> The third concern is over the Shunt's relatively weak body strength. The Shunt is designed to slip when overloaded and can be used on double or single ropes. The slipping function negates the need for a strong body, as high forces should be impossible to reach. However, if the Shunt is loaded when it is only a short distance above a knot on the rope, it will be prevented from slipping by the knot and high forces could be achieved. This situation is possible in rope access, **and could result in the Shunt releasing the rope at forces as low as 4 kN**. The problem is exacerbated when the device is used on a single rope, as would be the case in rope access.[1]

9.      Petzl's executive representative Tom Adams indicated to Faulhaber on the phone that it would take his concerns back to the "design team," that they take it "really serious", that "people's safety is really important", and admitted that he and Petzl have received and participated in other "calls like this", yet Petzl has done nothing to protect or warn climbers like Craig Faulhaber.

10.      Petzl continued to ignore its inherently dangerous Petzl Shunt when it used for is foreseeable, express, or implied purpose without adequate warning to the climbing community and public, including residents of Colorado and the United States which makes the events alleged herein likely to be repeated in the future.

11.      Importantly, and in spite of the fact that the Petzl Shunt was designed for self-belay and rope soloing, and that it was endorsed and advertised for these purposes by Petzl for decades,

---

[1]"Industrial rope access – Investigation into items of personal protective equipment", HSE Contract Research report 364/2001 at pp. 36 (emphasis added).

Mr. Adams claimed that he didn't know that climbers were using the Shunt for rope soloing, further concealing the truth about the safety hazards associated with the climbing community's knowledge and foreseeable use of the product.

12.     In fact, following Craig Faulhaber's unsuccessful and unsatisfactory call with Petzl, Faulhaber discovered that another Colorado-resident, Trevor Stuart, who is also an experienced climber was seriously injured when he fell in West Virginia on November 30, 2021, while using the Petzl Shunt with stopper knots as a backup.  Stuart's Petzl Shunt also failed allowing his safety rope to unexpectedly detach from the Shunt causing the climber to fall from 60 feet above the ground causing life-threatening injuries, a flight for life, and 7 days in the ICU.

13.     This is significant because had Petzl taken timely or reasonable action after receiving express notice in early November, 2021 of the Faulhaber event in Colorado, had it not continued to conceal the defects in the Shunt, had it not pretended that it did not know how consumers were actually using the product, Petzl may have been able to prevent – through a timely recall, or adequate warnings on social media, by its influencers, its website, through its "experts" and retailers, or a variety of other publications which Petzl influences – Trevor Stuart from falling to his near death only a few weeks later in West Virginia.

14.     When Faulhaber and the other climber were rescued by first responders, both climbers were found with their Petzl Shunts still attached to them and undamaged.  This is important because it clearly indicates that both Shunts failed becoming detached from two expert-level climbers' safety ropes within 90-days of each other in two different states.  Consequently, it is very likely that other unwitting climbers have fallen to their death, or sustained serious bodily injury, not because of the expected risks associated with climbing, but because Petzl refuses to

adequately warn the climbing community that the Shunt can become detached from a climber's rope or fail upon impact with a backup, such as a stopper knot.

15.     Since his accident, and to get the word out to the climbing community about the inherent dangers of the Petzl Shunt, Craig Faulhaber gave an interview to Climbing Magazine, a prominent climbing magazine with distribution throughout Colorado and Untied States.  Climbing Magazine delayed publication of the article until after Petzl, a large and influential contributor to the magazine through "sponsored content," while waiting on Petzl's comments on the article before publication.

16.     Petzl is a prominent content sponsor in this magazine, a publication that also conducts numerous reviews of Petzl's products and videos, killed the article for several months, and then when it was published finally on January 12, 2022, it had material and significant and material alterations to it, seemingly from Petzl, which further exacerbate the material misinformation in the marketplace about the Shunt's inherent dangers, regardless of use.

17.     Petzl could easily, given its influence and resources, sponsor content on the serious safety risks associated with rope soloing while using the Petzl Shunt given its known and widespread use amongst climbers for that purpose.

18.     Petzl could also have been intellectually honest about the Shunt in the January 12th article published by Climbing Magazine, recalled the product, refunded the purchase price of the product, and expressly stated that the Shunt should not be used for top rope soloing *because* the rope has been shown to detach from the device *and* fail upon impact with a backup, such as a stopper knot.

19.     Given Petzl's widespread use of "sponsored content" in this magazine, its acts holding up the publication of an article that could inform the climbing public about the hazards of the Petzl Shunt is an intentional act that is exposing even more climbers to the risk of death or serious bodily injury every day that goes by for its own profit.

20.     Petzl has likely made tens of millions of dollars through its sale of the Petzl Shunt in Colorado, the United States and around the world because of its failure to warn the climbing community of the risks associated with a safety rope detaching from the Shunt during a fall, specifically what the Shunt is intended to protect people from.

21.     Petzl refuses to warn climbers, or even be honest, expressly about the life-threatening dangers of using the Petzl Shunt or withdraw the product from the market because it knows full well that it would cost Petzl millions of dollars per year in lost sales and lost profits.

22.     Petzl's conduct, as described herein, was extreme and outrageous, willful and wanton. Defendant risked the lives of the consumers and users of their products, including Plaintiff's, with knowledge of the safety and use problems and suppressed this knowledge from the general public.

23.     In fact, Petzl continues to risk the lives of climbers in Colorado, the United States, and around the world by having a product on the market without reasonable or adequate warnings and without recalling it altogether with a full refund to consumers.

24.     Defendant made conscious decisions not to redesign, recall, re-label, warn or inform the unsuspecting consuming public for its own profit.

25.     Defendant's outrageous conduct warrants an award of punitive damages.

26.     Petzl appears to be putting profits over people:  To prevent other climbers from suffering death and serious bodily injury and to compel Petzl to finally act, this action follows.

## II.     THE PARTIES

27.     Plaintiff is a citizen and resident of the State of Colorado.  Prior to the events described herein, Craig Faulhaber was a math teacher and former Chair of the Mathematics department at a metro-area community college.

28.     Defendant, Petzl America, Inc., is a corporation organized under the laws of the State of Utah, with its principal place of business located at 2929 Decker Lake Dr., West Valley City, Utah.

29.     Petzl America's registered agent is Rashelle Perry who is co-located with Petzl America at its principal place of business in Utah at 2929 Decker Lake Dr., West Valley City, Utah.

30.     Petzl Distribution represents that it is a limited liability company with its headquarters at ZI Crolles, Cidex 105 A, 38920 Crolles, France.

31.     BIG BANG Corporation, which represents to be a limited liability company with headquarters at ZI Crolles, Cidex 105 A, 38920 Crolles, France wholly owns or controls Petzl Distribution and Petzl America.  Big Bang does business within the United States through is agent and subsidiary Petzl America.

32.     The Petzl trademark, which is affixed to the packaging of the Petzl Shunt which is the subject matter of this action, is registered with the United States Patent and Trademark Office. The Trademark is registered to Big Bang.

33.     Petzl America is the primary, in fact the sole, distribution company and agent within the United States for all products designed, manufactured, marketed and sold for Petzl Distribution and Big Bang, which also own or control Petzl America.  Each of these entities maintain a common website at www.petzl.com and are owned and controlled as a "family business" by Paul Petzl as their president.[2]

34.     When Faulhaber contacted Petzl America after his fall in order to alert the company of the dangers associated with the product's foreseeable and widely known use in the climbing community for top rope soloing, Petzl's Utah-based representative referred to Petzl as Petzl.

35.     Together, Petzl America, Petzl Distribution, and Big Bang will be referred to herein as the family owned and controlled business that it advertises around the world and within the State of Colorado to be: "Petzl."

### III.     JURISDICTION AND VENUE

36.     This case arises under the laws of the State of Colorado and the individual United States.

37.     This Court has jurisdiction to resolve any state law claims brought by the Plaintiff under 28 U.S.C. § 1367 and under Colorado law pursuant to C.R.S. § 13-1-124 because Petzl intentionally transacted business within the State of Colorado and committed, in-part, the tortious acts described herein within Colorado which caused the injuries described herein to Plaintiff in Colorado.

---

[2] https://www.petzl.com/brand/s/Family-Ownership?language=en_US

38.     The Court has jurisdiction over Plaintiff's claims based on diversity of citizenship under 28 U.S.C. § 1332 because Plaintiff's claims exceed $75,000, exclusive of interest and costs.

39.     The Court has original jurisdiction over Plaintiff's class claims under the Class Action Fairness Act of 2005 ("CAFA") which provides that United States district courts have original jurisdiction over class actions in which, among other things, the matter in controversy exceeds $5 million in sum or value under 28 U.S.C. §§1332(d)(2), (5), and provides that to determine whether a matter exceeds that amount the "claims of the individual class members shall be aggregated" under § 1332(d)(6).

40.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391 because the defective product was intentionally marketed and sold to Plaintiff in Colorado within interstate commerce.  Plaintiff sustained injuries caused by Defendant's conduct which was intentionally directed at Colorado and around the world.  A substantial part of the events or omissions giving rise to the claims occurred in Colorado.

## IV.     CLASS ALLEGATIONS

41.     Plaintiff sues on his own behalf and on behalf of a class of persons under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

42.     The potential class of Petzl Shunt customers is so numerous that joinder of all members is impracticable with respect to the defective product also sold without reasonable warnings, negligence, breaches of warranty, unjust enrichment, representations and misrepresentations, and concealment Petzl made to consumers, members of the climbing community, climbing publications, and social media influencers relating to the use and safety, or lack thereof, of the Petzl Shunt.

43.     There are questions of law or fact common to the class.

44.     The aggregate class claims exceed $5 million USD.

45.     The claims and defense of the parties are typical of the claims or defenses of the class.

46.     The representative parties, including the Plaintiff Craig Faulhaber, will fairly and adequately protect the interests of the class.

47.     Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class or would substantially impair or impede the ability of class members to protect their interests.

48.     The District of Colorado is a desirable forum because, including but not limited to, it has a large number of residents and visitors engaged in climbing activities in its Rocky Mountains using Petzl products, it is centrally located, and it is within the same Circuit Court of Appeals as Petzl's principal place of business in the United States, Utah, which also shares a border with Colorado.  Further, the first two known injuries sustained by climbers were both sustained by Colorado residents at the time of their injuries.

49.     No difficulties are likely to be encountered in the management of this class action, including the any hypothetical bifurcation of any claims not suitable for class certification because of disparate personal injuries which may be better suited for consolidation into a multi-district litigation, which should also be centralized within the District of Colorado,  that would preclude its maintenance as a representative action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

## V.      GENERAL ALLEGATIONS

50.      The Petzl Shunt was designed, manufactured, marketed and sold to climbers, such as Craig Faulhaber in Colorado, the United States and around the world to serve as a safety device specifically intended to prevent death and serious bodily injury to the climber(s).

51.      Paramount to any product, such as the Petzl Shunt, which is intended and foreseeably as a safety device to prevent a climber from hitting the ground after a normal fall, the climber's rope should never, ever, detach from the device.

52.      The Petzl Shunt is unsuitable for its designed, known and foreseeable use, top rope soloing (a/k/a self-lining, top roping, and self-belay), because the rope can detach from the Shunt during a normal fall by a climber, such as the one sustained by Craig Faulhaber, causing death or serious bodily injury.  The Shunt is defectively designed for its for its foreseeable and known uses, including but not limited to top rope soloing.

53.      Petzl failed to reasonably warn Plaintiff and other climbers within Colorado, within the United States, and around the world, that a climber's rope could detach from the Petzl Shunt during a normal fall causing death or serious bodily injury to the user of the Shunt.

54.      Petzl also failed to reasonably warn that the Shunt could fail and detach from a climber's rope upon impact with a well-known backup, such as a stopper knot.

55.      Petzl advertises that "for 50 years, Petzl has been built around four pillars, four fundamental values that motivate every decision we make: remaining a stable family business, encouraging innovation to imagine the best solutions, insisting on industrial excellence with the

goal of zero defects, and remaining engaged with our communities by providing global best practices."[3]

56.     Petzl designs, manufactures, distributes, and sells outdoor products utilized by professional and sport climbers around the world.  Petzl advertises[4]:



57.     Petzl also advertises that: "We have a deep responsibility to the people who trust us with their lives, and **we develop, test, and qualify** all of our products above required standards. Our design center, based in France, integrates all crafts that are related to the creation of products: mechanical, textile, electronic, optical, and technological. From the design and prototype phases,

---

[3] https://www.petzl.com/brand/s/?language=en_US
[4] https://www.petzl.com/brand/s/?language=en_US

the reliability of a product and the safety of the user are continuously evaluated, with particular attention to risks of use" (emphasis in original)[5].

58.     Petzl is one of the largest manufacturers, suppliers, promotors, and advertisers of recreational and professional climbing gear in the United States and across the globe.

59.     From Boulder to Ouray, to Summit County; Colorado has a large number of climbers, an extensive and large climbing market, and is one of Petzl's largest markets in the United States and around the world.

60.     As of 2018, approximately 5 million people in the U.S. participate in outdoor or indoor climbing[6].   As recently as 2017, The American Alpine Club estimates that climbing contributed $12.45 billion to the economy,[7] and was expected to grow.

61.     Climbing is big business in Colorado. Petzl knows this and profits from it as one of the most well recognized and trusted manufacturers of mountaineering equipment who directly, intentionally and continuously directs marketing, sales, and its products in interstate commerce at climbers in Colorado.

62.     The Petzl website indicates at least thirteen (13) Petzl "dealers" on its website in Colorado, including Petzl "Experts" retailers, providing location and contact information for each.

63.     Plaintiff purchased the Petzl Shunt, a/k/a Petzl Shunt Ascender, from one of Petzl's Experts in August 2021.

---

[5] https://www.petzl.com/brand/s/Industrial-Excellence?language=en_US
[6] https://smallbusiness.chron.com/rock-climbing-industry-analysis-80142.html
[7] https://sgbonline.com/study-reveals-climbings-powerful-impact/

64.     The same Petzl Expert publishes on its own website linked to the Petzl Shunt a 5-star review with text that states: "I've also used it to rope solo or take photographs…"

65.     The same Petzl Expert advertises in another review of the Petzl Shunt, a/k/a ascender, that it can be used for "top rope soloing."

66.     In yet another 5-star review of the Petzl Shunt, the Petzl Expert advertises a review that states: "Dont (sic) be fooled by reviews from those who don't (sic) know what they're doing; this is a great device for top rope soloing".

67.     There is no doubt that Petzl knows, or at least should know, that its Shunt is being used for top rope soloing and self-belay.  In fact, the Shunt is being used almost exclusively for top rope soloing based upon Plaintiff's experience and observation.

68.     There also appears to be little doubt that Petzl has failed to not only reasonably warn consumers, but it has also failed to reasonably warn its authorized "retailers" and "experts."

69.     Petzl is profiting from this foreseeable and known use of the Shunt to this very day without adequate warning to consumers, the public, and climbers throughout Colorado and the United States.

70.     Petzl is one of the most well-known and prolific advertisers in prominent climbing publications, such as magazines widely read by climbers, including Craig Faulhaber in Colorado and within the United States.

71.     Petzl endorses prominent climbers and social influencers who market and otherwise endorse Petzl and its products, including the Petzl Shunt, for uses beyond those which Petzl specifically may endorse.  Petzl knows this, encourages it, and profits from the practice on social

media platforms such as YouTube through videos which are viewed tens of thousands of times by climbers, such as Craig Faulhaber, in Colorado, the United States, and around the world.

72.     One such application is the use of the Petzl Shunt as a fall prevention device for top rope soloing.

73.     Petzl, through its headquarters in Utah, acts as the distribution center, heartbeat, and conscious for all of North America.

74.     In spite of Petzl's advertisements, for many years Petzl has known about the safety related defects to the Petzl Shunt and did nothing to recall, re-manufacture, fully remedy the design defects related to the Shunt's intended purpose, or reasonably warn foreseeable users about the hazards Petzl had actual knowledge of, specifically as it relates to a climber's rope detaching entirely from the Shunt resulting in death or serious bodily harm.

75.     Petzl intentionally, purposely, fraudulently, and systematically concealed the defects and hazards related to the Shunt from Plaintiff, Government Regulatory Agencies, such as OSHA, and the general public.

76.     Craig Faulhaber is an experienced rock climber and has been an enthusiastic climber since 2008.

77.     On September 19, 2021, Craig was climbing in an area known as Haus Rock, located between Keystone and Montezuma in Summit County, Colorado.

78.     As an experienced climber, Plaintiff was climbing by himself or "soloing" utilizing a top rope method.  This means that Plaintiff did not have another person to belay him, instead, he relied upon the Shunt for this purpose.

79.     Belaying is when a climber's rope runs through the protection to a second person called the belayer. The belayer wears a harness to which they have attached a belay device. If the climber falls, the belayer arrests the fall through a variety of techniques.

80.     In contrast, top rope solo climbing is a form of top-roping that doesn't require a second person to act as a belayer.

81.     Top rope soloing generally requires the climber to self-belay and removes the need for and participation of a climbing partner.

82.     While top rope soloing, a climber generally attaches to his or her rope, and the devices utilized for self-belay and fall protection, such as the Petzl Shunt at-issue in this action, are intended to slide up with the climber as the climber ascends the rope, but never back down which provides fall protection to the climber.

83.     Faulhaber fell while using the Petzl Shunt approximately 30 times before the critical failure on September 19, 2021.

84.     However, during the critical failure on September 19, 2021, in Summit County, Faulhaber's rope detached from the Shunt during a fall and caused Faulhaber's life threatening and altering injuries that required past and future medical care.

85.     Plaintiff was approximately 30-35 feet off the ground when he fell, and Defendant's product did not arrest the fall as it was intended to. As a result, Plaintiff fell to the ground and was severely injured.

86.     Despite Petzl's recommendations for use, when Faulhaber fell and the Shunt failed to prevent him for sustaining serious bodily injuries, Faulhaber was using it for its reasonably foreseeable and known use, fall prevention during top rope soloing.

16

87.     Further, evidencing the reasonable need for a prominent warning on the exterior of the Shunt's packaging materials, e.g. the Box – *expressly and unambiguously warning against self-belaying, top roping, or self-lining because the Petzl Shunt can easily detach from the climber's rope and cause death or serious bodily harm* – at least one retailer who offers Petzl products, including the Petzl Shunt for sale within the United States in Colorado advertises the following warning from Petzl, which specifically permits self-belay to this day, which Petzl knows or should know (emphasis added in advisement):



88.     Petzl also sponsors climbers who author stories and create videos about successfully using the Petzl Shunt for top rope soloing and self-belay.  One Petzl-sponsored climber and author, Andy Kirkpatrick, expressly recommend the Petzl Shunt as one of the best two devices for top rope soloing, advertising and marketing that the Shunt is the most popular self-lining device (even though it is not recommended for self-lining), has been used for decades for this purpose, has been recommended by Petzl for this express use in the past, has been demonstrated to work, and stating that <u>it can't be removed from a rope</u>.[8]  Petzl knows, or should know this, that it is false, and to this day does not expressly and unambiguously warn climbers not to use the Shunt for rope soloing *because* it can detach from the rope causing death or serious bodily injury.

89.     Today, Petzl continues to remain essentially silent while Andy Kirkpatrick recently posted a video following Faulhaber's 9/19/21 fall (and the subsequent fall by a climber in West Virginia shortly after Faulhaber's fall) by another rope solo expert titled: "How the Petzl Shunt Can Kill You" by Yann Camus of BlissClimbing.com which received more than 20,000 views since it was first uploaded very recently on December 6, 2021.

90.     In Camus's recent video created after the Faulhaber incident, the social media influencer now acknowledges that he has discovered at least one way that the climber's rope can "easily" detach from the Shunt, which Petzl knows or should know, and that the Shunt is "very dangerous."

---

[8]https://www.andy-kirkpatrick.com/blog/view/self-lining

91.     In spite of this publicly available simple video demonstration by Camus, Petzl continues to stick its proverbial head in the sand about all of this as evidenced by the January 12, 2022 Climbing Magazine article published about Faulhaber and the West Virginia climber which Petzl falsely manipulated for its own self-serving benefit.

92.     Petzl continues to ignore the life-threatening product it manufactures and sells to unsuspecting consumers such as Plaintiff.  Petzl continues to fail to recall its dangerous product when used for its foreseeable and known use, self-belay and rope soloing, and has failed to reasonably warm consumers and members of the climbing public about the known dangers of a climber's rope detaching from the Shunt causing death or serious bodily injury.

93.     Clearly, prior to Faulhaber's injuries and public comments, climbers did not reasonably know that using the Shunt during top rope soloing could kill a climber and this reality rests squarely at the feet of Petzl, a family-owned company which purports to care deeply about safety of its customers and the quality of its products, except apparently when it effects Petzl's profitability.

94.     This further illustrates the reasonable need for either (1) an unambiguous and express boxed warning on the exterior of the Shunt's packaging that the device should not be used for self-belay, tope roping, self-lining, etc., *because* the rope can detach from the Shunt during a routine fall and cause death or serious bodily injury to the climber, or preferably (2) to prominently and publicly recall the product from the market as an inherently dangerous product given its known and foreseeable use by climbers.

95.     Ambiguous misinformation which economically benefits Petzl is causing climbers around the world, the United States, and in Colorado to be subject to a known, foreseeable, and

unreasonable risk of death or serious bodily injury from the Petzl Shunt. As one public comment

suggests: *Climbers are falling from the sky*.

96.     To this day even Petzl's current recommendation for self-belying is unreasonable

and a material misrepresentation given the experience and knowledge of the expected and

foreseeable user of its products, especially when compared to the catastrophic and foreseeable risk

of the rope detaching from the Shunt if it becomes inverted or impacts a stopper knot.

97.     For example, buried deep on its website – and not on the package or in the materials

contained within the Shunt's package – and in a relatively new use for the Shunt as a "rappel

backup device" (an overly complicated and unlikely use for the product) is a statement that the

Shunt is not recommended for self-belying only because:

> The probability of experiencing these malfunctions is very low, but not
> negligible, and it only takes once...
>
> Greater danger on sloping terrain where pressure against the device can
> impede locking. The device will not lock if the user grabs the device during
> a fall. This device is not suitable for self-belaying.[9]

98.     However, in spite of this, Petzl knows full well that the Shunt is being used

extensively for self-belay and rope soloing, the use that is not only foreseeable, but is also the use

it was designed for.

99.     Further, it is more likely than not that other climbers, before and after Faulhaber's

fall, have been injured and killed by Petzl's failure to reasonable warn and its failure to recall the

Petzl Shunt from the marketplace, including Colorado who are similarly situated and do not know

---

[9] https://www.petzl.com/US/en/Sport/Appendix-1--Petzl-does-not-recommend-using-only-one-ascender-for-self-belaying-?ActivityName=Rock-climbing

about the cause of their falls because of the fraud and concealment of the known risks of using the Shunt being perpetrated on the climbing community by Petzl.

100.   Similarly, Petzl also fails to reasonably warn climbers, such as Plaintiff, about the effect which rope size could have on the operation of the Shunt as it relates to the potential for the rope to entirely detach from the device.  Consequently, rope common rope sizes are routinely used on the Petzl Shunt by unwitting climbers to the catastrophic result that follows the Shunt detaching from a climber's safety rope.

101.   Petzl profited from this use, and continues to do so, despite its ambiguous recommendations for use and other warnings that were not reasonable given the known, intended, and foreseeable use of the device.

102.   The Shunt failed to prevent Faulhaber's fall because the rope detached from the device during a routine fall through a designed and manufactured gap/slots in the device seen below:



103.   During Faulhaber's fall, it is likely that the climber's rope snagged in the top of the Shunt, tilted sideways or inverted (e.g. a "Scorpion Catch"), and the rope ripped through the

intentionally manufactured gap/slot at the end of the red arrow above.  Most likely, the Shunt tilted sideways and then snagged during the fall, where a relatively light load is sufficient to compress the diameter reasonable and commonly used climbing ropes, such as Plaintiff's, and force it through the gap/slot depicted above.  Then, the climber falls to the ground foreseeably sustaining serious bodily injuries or death.

104.    When the device and the rope which Faulhaber used on September 19, 2021, were recovered by Summit County Mountain Rescue, neither the rope nor the Shunt were damaged, the Shunt was attached to Faulhaber, but the rope was not.  This indicates that the rope detached from the Shunt which was intended to prevent falls such as the one sustained by Craig Faulhaber.

105.    After the fall, Craig tried to get up, but another climber stopped Craig from moving and held him in his lap for 45 minutes to keep him alert until medical rescue arrived.  Faulhaber remembers the feelings and sound of hitting the ground with high velocity and seeing his own blood pooled on the ground.

106.    This was by any reasonable account a near death experience.

107.    Multiple witnesses to the fall immediately called emergency services and the Summit County Rescue Group responded to the call[10]. After the fall, one of the witnesses commented that "his rope was still hanging there, and it was straight vertical" showing that Defendant's product had completely detached from the rope. No such warning of this type of event was detailed in any of the warnings provided with Defendant's product.

---

[10]  https://www.summitdaily.com/news/crime/summit-county-rescue-group-saves-climber-who-fell-30-feet-near-montezuma/

108.    After being evaluated by the Summit County Rescue Group and deemed to be in critical condition, the Summit County Rescue Group performed a "scree evacuation" to get Faulhaber to a position where he could be safely transported off the mountain by ambulance.

109.    Once Plaintiff was stable as possible, securely and safely off the mountain, he was driven by ambulance to the Keystone Medical Center where he was then life flighted to St. Anthony's Trauma Center in Lakewood, Colorado.

110.    As a result of the fall, Plaintiff fractured approximately 12 bones including the L1 and L2 vertebrae in his back, both heels, his pelvis, knee, right elbow, sacrum, and ribs. As of today, it is anticipated by his medical team that Craig Faulhaber will need to spend months confined to a wheelchair and unable to live freely outside of an ADA accessible hotel room.

111.    After falling off the mountain following the failure of the Shunt, Craig Faulhaber had extensive medical interventions after a flight for life to St Anthony's Medical Center in Denver resultant from breaking both heels, feet, right knee, two vertebrae, pelvis, right elbow, and multiple ribs.

112.    On September 21, 2021, Plaintiff underwent surgical intervention to his pelvis caused by the failure of the Petzl Shunt.

113.    Plaintiff was thereafter transferred to Swedish Hospital for impatient Physical and Occupational Therapy, which was often painful, where he remained hospitalized until October 6, 2021.

114.    Unable to return to his residence, Plaintiff was forced to move into an ADA accessible hotel room because he was confined to a wheelchair for mobility, and where he resided until December 18, 2021, as a direct and proximate result of his injuries and lack of mobility.

115.    Plaintiff is reasonably expected to have long term and accelerated degenerative arthritis which may require premature joint replacement to his hips, ankles, and knees, together with the loss of enjoyment of life, past and future medical expenses, permanent impairment, scarring, mental and physical suffering and loss of wages and earning potential.

116.    As a result of this life-threatening event, Plaintiff is also unfortunately at an increased risk of adverse psychological, emotional and mental pain and suffering, which may include PTSD, anxiety, or depression.

117.    Today, Craig continues to struggle with basic life functions, like walking without a walker or using a wheelchair, even though he has willed himself back onto the climbing wall inside of a gym.  Faulhaber remains unable to journey to the mountains he loves because he does not have sufficient mobility to safely hike un-even terrain.

118.    Despite Petzl's knowledge and express or implied endorsement for use, there are no warnings of falling, rope detachment, death or serious bodily injury when using the Petzl Shunt while top rope soloing, self-belaying, or self-lining on the Petzl Shunt's box or in the materials provided with the Shunt inside the box.

119.    At the time Craig Faulhaber's injuries, there was no warnings on the Petzl controlled and operated website or marketing materials, let alone on the Shunt's packaging or in the package, relating to this known defect and danger, *i.e.,* the climber's rope detaching from the Shunt causing death or serious bodily injury.

120.    On several rock-climbing websites, blogs, and information cites, the method of solo top roping utilized by Plaintiff was shown to be a very common, if not the most common, way of solo top roping in the experienced rock-climbing community.

121.    For example, Petzl knows, or should know, that a popular social media and climbing-influencer and professional climber Dave MacLeod published a YouTube video at https://youtu.be/kd13IaWS8gQ?t=782 and on other platforms such as epictv.com and his own blog with approaching 300,000 views showing climbers how to top rope solo using the Petzl Shunt which Petzl undoubtedly profits from banner ads and pop-up advertisements.

122.    One review of MacLeod's article on the use of the Petzl Shunt while top roping "was enough to make me want to immediateley (sic) order one[11]."  Petzl knows and profits from this.  Climbing forums also to this day share how to use the Petzl Shunt for self-belay on a top rope using Petzl's own materials further illustrating the need for warnings on the packaging or a total recall/refund of the inherently defective product which was designed for self-belaying:[12]



---

[11] https://www.mountainproject.com/forum/topic/106638387/best-solo-tr-device
[12] https://www.mountainproject.com/forum/topic/106044879/modifying-your-gri-gri?page=2 ("One of my route-setting partners uses a Petzl Shunt to solo self-belay on a toprope. He attaches the Shunt to his harness with a locking carabiner and uses a weighted toprope. The system seems to work very well for him, even on hard, steep routes. There are some caveats about doing this in Petzl's instructions for use")

123.    In Faulhaber's phone call to Petzl after his fall, Plaintiff made Petzl aware, to the extent that it was not already, that the use of the Shunt was a very popular set up for top rope soloing advising Petzl that the climbing community did not appear to know that a climber's rope could detach from the Sunt causing a serious fall.

124.    Since Craig Faulhaber's and the West Virginia climber's injuries this professional climber and social media influencer has removed his very popular video.

125.    A screen shot of this video – perhaps the most viewed top rope solo video of all time – before it was taken down follows:



126.    There are numerous other publicly available forums which Petzl knows or should know about which discuss the use of the Petzl Shunt for self-belay and rope soloing.[13,14]

127.    The most prominent use for the Petzl Shunt around the world is as a safety and fall prevention device during top rope soloing. Petzl knows or should know this and it is at least foreseeable.

128.    In-fact, there is no doubt that Petzl knows about the climbing public's use of its Shunt for top rope soloing and fall protection and that Petzl has made millions of dollars as a direct result.

129.    Despite this, Petzl failed to recall the product, failed to re-manufacture it so that the climber's rope cannot separate from the device by increasing the gauge thickness of the metal or decreasing the size of the machined gaps/slots, or adding a latch to make the Shunt a closed system, and failed to reasonably warn consumers such as Craig Faulhaber about the risks associated with the rope "easily" detaching from the Shunt and that it was "very dangerous" when used for self-belay or rope soloing, and failed to be transparent and fully honest in the recent Climbing Magazine article published in Colorado and around the U.S. on January 12, 2022.

130.    In fact, the opposite is true insofar as Petzl knew or should have known that the real risk of using the Shunt while rope soloing is not that it can "jam" in overhang situations, but rather that the rope can detach from the device and kill or seriously injury the user.

---

[13] https://www.mountainproject.com/forum/topic/106638387/best-solo-tr-device
[14] https://www.ukhillwalking.com/forums/gear/self_belay_-_is_the_shunt_still_king-727297

131.   Petzl failed to issue a product recall, failed to re-manufacture the device, and failed to place a prominent and easy to understand warning on the packaging all in an effort to increase its profits from the risks which skilled, yet unknowing, climbers such as Craig Faulhaber took using the Shunt.

132.   Petzl has failed to recall the Shunt or place a prominent warning on the outside packaging of the device because it knows that such action will cause Petzl to sustain significant financial losses insofar as it knows climbers, such as Craig Faulhaber, would not buy nor use the device at all.

133.   Since Faulhaber's fall and injuries, Petzl released on social media, including Instagram and Facebook on December 20, 2021, that the fall resulted from the rope reportedly detaching from the Shunt.  Despite this, Petzl continues to fail to recall the device and continues to fail to include on the exterior of the packaging a reasonable and prominent warning that a climber's rope can detach from the Shunt during self-belay or top rope soloing during a fall which can cause death or serious bodily injury.

134.   Prior to this social media post, Petzl has never warned consumers and climbers such as Faulhaber in any reasonable manner that a climber's rope can detach from the device through a gap/slot in the Shunt during a normal fall causing death or serious bodily injury.  This is particularly important because the Shunt was at least once expressly approved for self-belay by Petzl, even though it opaquely warns against the practice without specific or reasonable reference to the climber's rope detaching and separating from the Shunt during a fall resulting in death or serious bodily injury, which is the foreseeable risk that Petzl knows about.

135.    For example, to this day on the Petzl website's FAQ's, one question asks:  "Can I use  the  SHUNT  to  self  belay?"    Petzl's  answer[15]  is  anything  but  reasonable  under  the circumstances – "No, the SHUNT is not authorized for self-belaying, for many reasons, including but not limited to, the risk of the cam jamming in an overhang situation."

136.    First, this is important because (i) a "jam" in an overhang situation and (ii) a rope detaching  and  separating  from  the  device  are  inapposite  to  each  other  in  terms  of  risk  to  the climber, with the later having the obvious potential to cause death or serious bodily harm while the former is generally a minor inconvenience to a climber.

137.    Second,  this  FAQ  response  unreasonably  ignores  the  numerous  videos  and publications, some of which are endorsed and sponsored by Petzl, which describe how to use the Petzl Shunt for self-belay, top rope soling, and self-lining.

138.    Reacting to a forum thread about Faulhaber's experience with the Petzl Shunt and illustrating  the  inadequacies  of  Petzl's  warning  about  the  Shunt,  a  device  designed  and  once approved  expressly  for  top  rope  solo  and  self-belay,  one  Colorado  climber  posted  on  a  public climbing  forum  on  December  11,  2021,  a  truth  revealing  meme  which  shows  not  only  the unreasonableness of the warning, but also the outrageousness of Petzl's purported warning about the possibility of a cam jamming in an overhang:

---

[15] https://www.petzl.com/US/en/Sport/FAQ/can-i-use-the-shunt-to-self-belay



139.     Petzl is clearly profiting from its ambiguous misinformation about the risks associated with using the Petzl Shunt for its foreseeable and known actual use, top rope soloing.

140.     This failure to reasonable warn, or altogether recall the product from the market, is intentional and results in significant profit to Petzl at the expense of climbers such as Craig Faulhaber.

141.     For example, after Faulhaber's injuries he contacted Petzl directly and notified them of the events and his injuries.  Petzl admits this in its December 20, 2021, social media posts.

142.    However, rather than taking prompt action to reasonably warn the climbing community, or recall the product, Petzl did little if anything beyond delaying the publication of the January 12th Climbing Magazine article and then manipulating it with opaque partial truth.

143.    To this day Petzl continues to fail to reasonably warn on and in its packaging, on its website, in its technical publications, and on social media also allowing an inherently dangerous product to remain on the shelves of retailers, and in e-commerce everywhere, including Colorado.

### FIRST CLAIM FOR RELIEF
### (Strict Product Liability)

144.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

145.    Petzl is and at all pertinent times was the manufacturer and seller of the Petzl Shunt as defined by C.R.S. §§ 13-21-401, et seq.

146.    Petzl was engaged in the business of manufacturing and selling of the subject Petzl Shunt in interstate commerce, Colorado, and around the world.

147.    The Petzl shunt was defective and unreasonably dangerous to persons such as the Plaintiff who might reasonably be expected to be affected by the Petzl Shunt because the safety rope can detach from the Shunt which is intended as a fall prevention safety device through a gap/slot designed and intentionally manufactured into the device.

148.    The Petzl Shunt was expected to reach the users without substantial change in the condition in which it was sold.

149.    Plaintiff was a person who could reasonably be expected to use and be affected by the subject Petzl Shunt.

150.    The defective condition of the Petzl Shunt was a cause of the injuries, damages, and losses sustained by the Plaintiff in amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Failure to Reasonably Warn)

151.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

152.    Defendants had a duty to warn Plaintiff and other similarly situated, foreseeable, and expected users of the Petzl Shunt of the serious injuries that could be sustained through the common use of the Shunt resultant from the safety rope detaching from the device under relatively small loads.

153.    Petzl knew, or in the exercise or reasonable care should have known, about the risk of serious bodily injury and death, including permanently disabling and life-threatening injuries that could arise through the common, known, expected and foreseeable use of its Shunt.

154.    Petzl failed to provide warnings or instructions that a manufacturer and seller exercising reasonable care would have provided concerning the risk, or potential risk, of serious injury that could arise through the common, known, and foreseeable use of thee Shunt.

155.    A manufacturer and seller exercising reasonable care would have updated its warnings on the basis of reports of injuries and the plethora of information showing that their product was being used in a manner that could result in serious injury and which was foreseeable or actually known to Petzl.

156.    The warnings that were given by Petzl failed to reasonably warn known, foreseeable, and expected users and climbers of the known risks associated with the use of the Petzl Shunt in its commonly used, known, and anticipated method.

157.    Petzl has a continuing duty, which has been breached, to warn Plaintiff and others using their products of the dangers associated with the common and foreseeable and expected use of their products.

158.    The Plaintiff's injuries were the direct and proximate result of Petzl's failure to warn of the dangers of using the Petzl Shunt in the commonly and foreseeably used method.

159.    Petzl's failures to reasonably warn are material insofar as neither Plaintiff, nor those similarly situated, would have rationally used the Petzl Shunt had Defendant issued reasonable and timely warnings that the safety rope could detach from the Shunt under relatively small loads, i.e., a few kilograms, and that a stopper knot could also cause the Shunt to open and release the safety rope.

160.    The Petzl Shunt lacked sufficient warnings of the potential risks associated with the foreseeable or known use of the product.

161.    Petzl knew the risks directly associated with the design defects and ignored them. Moreover, Petzl provided incomplete and deceptive warnings about the product which were largely inconsequential given the risk of death and serious bodily harm from the use of the product which Petzl knew and could reasonably foresee.

162.    Petzl failed to reasonably warn Plaintiff, and others similarly situated, for its own profit.

163.    Petzl's failure to reasonably warn Plaintiff of the risks associated with using the Shunt for its known or foreseeable use is the cause of the injuries, damages, and losses sustained by the Plaintiff in amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**

**(Negligence)**

164.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

165.    Petzl designed, manufactured, marketed, distributed, and sold the Petzl Shunt in Colorado, the Untied States in interstate commerce, and around the world.

166.    Petzl was negligent by failing to exercise reasonable care to prevent the Petzl Shunt from creating an unreasonable risk of harm to the persons, such as Craig Faulhaber, who might reasonably be expected to use the Petzl Shunt while it was being used in the manner the Defendant might have at least reasonably expected.

167.    Craig Faulhaber, and others similarly situated, is one of those persons the Defendant should reasonably have expected to use the Petzl Shunt.

168.    Defendants had also a duty to consumers, such as the Plaintiff, to sell products which are safe for their intended, foreseeable, and expected use and to ensure that they were reasonably warned about known risks associated from foreseeable or known use of the Petzl Shunt.

169.    Petzl breached its duty by selling the Petzl Shunt because it is unsafe when used for its intended or foreseeable use and when it failed to provide a reasonable warning to Plaintiff and others similarly situated of the known risks associated with the rope separating from the Shunt under relatively light loads and cause death or serious bodily injuries when used in the manner it was, and is, commonly and foreseeably used within the rock climbing community.

170.    Petzl also failed to recall the Shunt after it knew or should have known that the Petzl Shunt was being used extensively for top rope soloing, and profiting from the use by climbers such as Plaintiff, which has caused at least one other climber to suffer life threatening injuries, and likely many others.

171.    Petzl breached its duties when it failed to recall the Petzl Shunt and when it failed to place a prominent warning on the packaging that the product's use during top rope soloing could result in the rope easily detaching from the Shunt during a fall and cause death or serious bodily injury under relatively light loads.

172.    As a direct result of Petzl's negligence, Plaintiff sustained physical injuries and damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

173.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

174.    Defendant, as a part of it business, sold the Petzl Shunt in Colorado, interstate commerce, and around the world.

175.    As a part of its business, Petzl had a duty to communicate truthful, accurate, and complete safety information to foreseeable and intended users of its Shunt, such as Plaintiff and other similarly situated.

176.    Petzl breached its duties when it negligently provided incomplete and inaccurate material information about the use of its Petzl Shunt to Plaintiff and when Petzl misrepresented the safety, use, and risks associated with its Shunt.

177.    This incomplete and inaccurate information created an untrue or mistaken impression in the mind of Plaintiff about the character, quality, and safety of the Petzl Shunt, all of which would be important to a purchaser or user of the Shunt in determining his or her course of action.

178.    Defendant also misrepresented the Shunt by failing to disclose that a climber's safety rope, such as the one used and purchased by Plaintiff, could easily detach from the Shunt under relatively light loads and that the Shunt could open and release the safety rope upon impact with a stopper knot.

179.    Plaintiff is a person who would reasonably be expected to use the Petzl Shunt.

180.    Plaintiff, and the climbing public, reasonably relied upon these, and other representations made by Petzl and its agents and product endorsers who also reasonably relied on Petzl's misrepresentations which caused Plaintiff's injuries and damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Fraudulent Concealment)

181.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

182.    Petzl concealed material facts which it knew relating to the use of the Petzl Shunt for top rope soloing and self-belay and the associated risk of the safety rope detaching or separating from the Shunt under relatively light loads or upon impact with a stopper knot which should in equity or good faith be disclosed.

183.    Petzl has actual knowledge that these facts are being concealed.

184.    At the time of his injuries, Plaintiff and others similarly situated was ignorant of these facts being concealed by Petzl.

185.    Petzl intended the concealment to be acted upon by consumers such as Plaintiff engaged in a known use of the Petzl Shunt.

186.    Petzl's fraudulent concealment caused Plaintiff and others similarly situated to sustain damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Unfair or Deceptive Tarde Practice - Consumer Protection Laws)

187.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

188.    Petzl used unfair methods of competition or deceptive acts or practices that were prohibited by law.

189.    Petzl violated consumer protection laws through its use of false and misleading misrepresentations or omissions of material fact relating to the safety and use of the Petzl Shunt.

190.    Petzl communicated the purported benefits and uses  of  the Shunt while failing to disclose the serious and dangerous deficiencies with its design, specifically as it relates to the detachment of the safety rope from the Shunt for a variety of reasons and under relatively light loads, to consumers, the climbing industry, social media influencers, and climbing publications. Petzl made these representations to such persons, including Plaintiff, in the marketing and advertising described herein.

191.    Petzl's conduct  in  connection  with the Shunt  was  also  impermissible  and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, safety, and advantages of the Petzl Shunt.

192.    Petzl falsely and recklessly, expressly and impliedly, represented that its Petzl Shunt could be safely used for the known and intended purpose of the device, which is fall

protection from death or serious bodily harm to foreseeable users of the device, such as Craig Faulhaber.

193.    Petzl publicly and widely disseminated print media, electronic media, and made other representations through product endorsers and social media influencers to prospective and actual consumers of its products, as well as to the general public, misrepresented the quality, standard, and grade of its products that Petzl knew was dangerous and unsafe for the Shunt's intended, known, and foreseeable use.

194.    Petzl also advertises the Petzl Shunt for a use separate and apart from the use that it knows or should know consumers such as Plaintiff actually use the Shunt for, specifically top rope soloing, self-belay, self-lining, and as an ascender.

195.    These misrepresentations were made expressly as a deceptive lure and inducement to members of the public, including Plaintiff, to enter a business transaction with Petzl to induce members of the public and Plaintiff to purchase and use Petzl's products, including the Petzl Shunt.

196.    The deceptive trade practices perpetrated by Petzl during times relevant to this Complaint directly involved the general public and significantly impacted the public as actual or potential customers of Petzl's products, including the Plaintiff Craig Faulhaber, numerous other customers within Colorado, the United States and around the world as consumers of Petzl's products, including the Petzl Shunt.

197.    Petzl failed to disclose known deficiencies in safety to actual and potential customers of its products, including the Petzl Shunt.

198.    Petzl's negligent or false representations or concealment made through their agents and/or employees, including but not limited to, the representations described herein constitute deceptive trade practices as defined by state law, including C.R.S. 6-1-105 (e) and (g), which the latter subsection provision permits this deceptive trade practice claim for all actual damages sustained and for treble damages under section 6-1-113 against a defendant who in the course of a business, vocation and occupation represents that goods, foods, services, or property are of a particular standard quality or grade, or that goods are of a particular style of model, if he know or should know that they are of another.

199.    Petzl acquired substantial money as a result of engaging in the above-described deceptive trade practices from Plaintiff and other customers of its product(s).

200.    As a result of these violations of consumer protection laws, Plaintiffs, named and yet to be named, have incurred and will incur; serious physical injury (including in some cases death), pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Petzl is liable.

201.    As a direct and proximate result of Petzl's deceptive trade practices, Plaintiff has incurred expenses and damages which will be proven at trial.

202.    Pursuant to statute, Plaintiff is entitled to all actual damages and attorney's fees under the CCPA.

203.    Pursuant to statute, Plaintiff is entitled to an amount equal to three times the amount of actual damages sustained to redress Petzl's post sales bad faith conduct as defined by state

consumer protection laws to include fraudulent, willful, knowing, or intentional conduct that caused injury.

## SEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment)

204.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

205.    At Plaintiff's expense, and those similarly situated, Petzl received a benefit under circumstances that would make it unjust for Defendant to retain the benefit without repaying the purchase price paid for the Petzl Shunt for all Petzl Shunts sold in Colorado and in interstate commerce within the Untied States.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Implied Warranty)

206.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

207.    Defendant sold the Petzl Shunt.

208.    Craig Faulhaber is a person who was reasonably expected to use or be affected by the Shunt.

209.    The Defendant was a merchant with respect to the type of product involved.

210.    The Petzl Shunt was not of merchantable quality at the time of sale for its known, expected, or foreseeable use.

211.    For example, at the time Petzl marketed, distributed and sold its Shunt to Plaintiff, Defendant warranted that it was merchantable and fit for the ordinary and foreseeable purposes for which it was intended.

212.    Members of the consuming public, including consumers such as Plaintiff, were intended beneficiaries of the warranty.

213.     The Petzl Shunt was not merchantable and fit for its ordinary and foreseeable purpose because it has a propensity to allow the safety rope to detach from the Shunt, itself a fall prevention device, under relatively light loads and upon impact with a common stopper knot which led to the serious personal injuries described herein.

214.     Plaintiff reasonably relied on Defendant's representations that the Shunt was safe and free of defects and was otherwise a safe means of reducing the risk of fall, death, and serious bodily injury while using a safety rope and climbing.

215.     Petzl's breach of the implied warranty of merchantability and fitness was the direct and proximate cause of Plaintiff's injury (including in some cases death) and damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### (Breach of Express Warranty)

216.     Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

217.     Defendant sold the Petzl Shunt.

218.     Petzl expressly warranted the Petzl Shunt to be guaranteed on its packaging for 3-years.

219.     The Petzl Shut was designed for self-belay and top rope soloing.

220.     Craig Faulhaber is a person who was reasonably expected to use or be affected by the Shunt.

221.     The Petzl Shunt was not as warranted.

222.     Within a reasonable time after the Plaintiff discovered or should have discovered the alleged breach of warranty, the Plaintiff notified the Defendant of such breach.

223.    The Defendant's breach of warranty caused the Plaintiff to sustain injuries, damages, and losses as alleged herein and as will be proven at trial.

**Plaintiff demands a jury trial on all claims and defenses so triable**.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, on behalf of himself and those similarly situated, respectfully requests that the Court enter judgment in his favor, for actual and compensatory damages, including damages for permanent impairment, scarring, pain and suffering, mental and emotional suffering, past and future medical expenses, loss of enjoyment of life and earnings and earning capability, and for leave to assert a claim for punitive and exemplary damages, and all damages in law or in equity, for attorney fees and costs pursuant to statute and law, treble damages pursuant to statute and law, together with pre-judgment and post-judgment interest, and for such other relief as the Court deems just and proper.

Dated: January 8, 2022

Respectfully submitted,

M^cLEOD │BRUNGER PLLC

*/s/ Scott D. McLeod*
Scott D. McLeod
Samuel R. Thomas
McLeod │Brunger PLLC
10374 Park Meadows Drive, St. 260
Lone Tree, CO 80124
smcleod@mcleodbrunger.com
sthomas@mcleodbrunger.com